IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SHAWN S.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 21-cv-149-RJD[2] |
| | ) |
| COMMISSIONER of SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM AND ORDER**

**DALY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to 42 U.S.C. § 423.

**Procedural History**

Plaintiff protectively applied for DIB and SSI benefits on February 20, 2018 (Tr. 17). ALJ Lisa Leslie held a telephone hearing on May 28, 2020 and issued a decision on September 30, 2020, denying Plaintiff's application (Tr. 17, 36). The Appeals Council denied review and Plaintiff filed a timely Complaint in this Court (Tr. 1; Doc. 1).

**Issue Raised by Plaintiff**

I. Whether the ALJ improperly evaluated opinion evidence;

---

[1] In keeping with the court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns.   See Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] Pursuant to 28 U.S.C. §636(c), this case was assigned to the undersigned for final disposition upon consent of the parties (Doc. 9).

II. Whether the ALJ substituted her opinion for that of a medical expert.

## **Applicable Legal Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform his former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 404.1520. Between steps three and four, the ALJ assesses the claimant's residual functional capacity ("RFC"), which is the claimant's "ability to work despite [his] health problems." *Reynolds v. Kijakazi*, 25 F. 4th 470, 473 (7th Cir. 2022); *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016). The ALJ "need only include limitations [in the RFC] that are supported by the medical record." *Reynolds,* 25 F. 4th at 473 (internal citations omitted).

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled. 20 C.F.R. § 404.1520. A negative answer at any step other than step 3 precludes a

---

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

finding of disability. (*Id*.).  The plaintiff bears the burden of proof at steps 1–4.  *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).  Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy.  *See id.*

Importantly, this Court's scope of review is limited. 42 U.S.C. § 405(g) ("the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive").  This Court determines whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014) (internal citations omitted).  The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ."  *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (internal citation omitted).  However, this Court does not act as a rubber stamp for the Commissioner.  *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Leslie followed the five-step analytical framework described above.  She determined that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of June 1, 2006 (Tr. 20).  She found that Plaintiff has the following severe impairments: 1) attention-deficit hyperactive disorder ("ADHD); 2) generalized anxiety disorder; 3) substance abuse disorder; and

4) panic disorder without agoraphobia.[4]  (Tr. 20).   However, she found that Plaintiff did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments" *(*Tr. 18.*)*.

ALJ Leslie determined that Plaintiff has the residual functional capacity to:

> [P]erform a full range of work at all exertional levels but with the following non-exertional limitations: he is limited to performing simple routine tasks and can perform work with productions expectations, but the work must not be at a fast pace such as an assembly line.  The claimant is limited to work that requires only occasional changes in the work setting and he can have occasional interaction with co-workers, but no interaction with the public.

(Tr. 24).

Plaintiff had no past relevant work (Tr. 34).   However, considering Plaintiff's age, and RFC, "there are jobs that exist in significant numbers in the national economy" that he can perform (*Id*.).    Therefore, Plaintiff was not disabled (Tr. 35).

### The Evidentiary Record

The Court reviewed and considered the entire evidentiary record in formulating this Order. The following summary of the record is tailored to Plaintiff's arguments.

**1.    Agency forms**

Plaintiff's father completed a Function Report on April 11, 2018 (Tr. 292).   He wrote that Plaintiff "suffered brain damage during childbirth as evidenced by a CT scan of brain" (*Id*.). He further noted that Plaintiff had "poor" attention, difficulty handling stress, and did not socialize with friends.    (Tr. 290, 291).

---

[4] Agoraphobia "is a type of anxiety disorder in which you fear and avoid places or situations that might cause you to panic and make you feel trapped, helpless or embarrassed."   https://www.mayoclinic.org/diseases-conditions/agoraphobia/symptoms-causes/syc-20355987 (last accessed March 25, 2022).

2. **Evidentiary Hearing**

Plaintiff testified that he lives with his father (Tr. 58). He had previously lived independently for a year, but his family felt that he needed to be around them more (*Id*.). He testified that "as an adult I haven't really functioned normally" (*Id*.). His symptoms-poor concentration, low energy, and "chronic and debilitating anxiety and fatigue"-started when he was an adolescent (Tr. 59). He has "never been able to function enough" to complete tasks (Tr. 60). He has had "quite a few panic attacks" that are caused by "nothing specifically, but being around people doesn't help" (Tr. 61).

The ALJ presented the following hypothetical to Stella Frank, vocational expert:

> …a hypothetical person of [Plaintiff's] age and education. No exertional limitations. The individual would be limited to performing simple, routine tasks, and can perform work with production expectations, but the work must not be at a fast pace, such as an assembly line. The individual would be limited to work that requires only occasional changes in the work setting, could have occasional interaction with coworkers, and no interaction with the public.

The vocational expert testified there are jobs available for that hypothetical person. She gave examples of "medium, unskilled" occupations: 1) industrial cleaner; 2) counter supply workers; 3) truck washer (Tr. 64). The vocational expert relied on the Directory of Occupational Titles for this information, except the DOT does not address "interactions with coworkers or supervisors, or work that may be fast-paced" (*Id*.). For those issues, the vocational expert relied on her "education, training, and experience" (*Id*.). The vocational expert testified that "if the individual needed to be reminded of tasks to perform, and also needed to have their work checked, both of those things, the reminders and the checking, six times a day" all work would be eliminated

for that individual, if the need for reminders and checking persisted after a 30 day training period (Tr. 64-65). If the individual was going to be off task for 20% of the workday, the individual could not perform fulltime competitive work (Tr. 65). If the individual had to leave work early, or was late for work, three times a month or more, he could not perform fulltime competitive work. (Tr. 66).

### 3. Relevant Medical Records

Plaintiff attended psychotherapy sessions with Dr. Dragan Svrakic in 2007. At most of those visits, Dr. Svrakic noted that Plaintiff's memory and attention/concentration were normal, his insight and judgment were fair, and his speech was normal (Tr. 373-79).

Plaintiff saw a neurologist (Dr. Riaz Naseer) at various times in 2011, 2014, and 2015; at each visit, Dr. Naseer noted that Plaintiff had normal concentration and a normal attention span (Tr. 426, 430, 437, 440). Plaintiff also saw Dr. David Montani, a psychiatrist, in 2014 (Tr. 407-19). Dr. Montani's records indicate that Plaintiff's flow of thought, memory, and attention/concentration were normal (Tr. 407-09, 411-15). In June 2015, Plaintiff presented to the emergency department ("ED") at a hospital in Granite City, Illinois, reporting that he thought he was having an anxiety attack or a seizure (Tr. 772). He "calmed down significantly" and was monitored by ED staff for two hours, remaining asymptomatic during that time (Tr. 772, 778). He was discharged at his own request (Tr. 778). The ED physician noted that his insight, memory, and judgment were normal (Tr. 777).

In 2016-2017, Dr. Blankenship (primary care practitioner) treated Plaintiff for, *inter alia*, ADHD ("primarily inattentive type") and anxiety. At every visit, Dr. Blankenship noted that Plaintiff exhibited good judgment, his recent memory was normal, and his mental status was

"active and alert" (Tr. 447-464).

Plaintiff started treating with Dr. Richard Gestring, a psychiatrist, in 2016 (Tr. 902, 968). Dr. Gestring treated Plaintiff for the following conditions: 1) opioid dependence, uncomplicated; 2) generalized anxiety disorder; 3) panic disorder without agoraphobia; 4) attention-deficit hyperactivity disorder, predominantly inattentive type. Dr. Gestring prescribed Suboxone to Plaintiff from 2016-2020 as part of "medication assisted treatment" for opiod dependence[5] (Tr. 902-953, 1145-1186, 1208-1228). Dr. Gestring also prescribed Adderall to Plaintiff starting in 2017 (Tr. 920-954).

At most visits, Dr. Gestring noted that Plaintiff's intelligence was average, his judgment and insight were good or fair, and he denied any acute symptoms related to depression or anxiety. (Tr. 902, 904, 906, 908, 910, 912, 914, 916). Dr. Gestring also frequently noted that Plaintiff's concentration was fair and his thought process was logical or concrete. (Tr. 910, 912, 912, 914, 916). At one visit, Plaintiff had "fleeting" suicidal ideations and his memory, concentration, judgment, and insight were poor (Tr. 918). He was "ready to come off of the Suboxone" (*Id.*). Dr. Gestring saw Plaintiff three weeks later and Plaintiff's memory, concentration, judgment, and insight were fair (Tr. 920). Plaintiff told Dr. Gestring that his overall situation was stable but he wanted to continue taking Suboxone (Tr. 920).

For the next three months, Dr. Gestring mostly assessed that Plaintiff's memory, judgment, and concentration were fair (Tr. 922, 924, 926, 930, 932)[6]. On two occasions, Dr. Gestring noted that Plaintiff's concentration was poor (Tr. 928, 932). In October 2017, Plaintiff again tried to

---

[5] Suboxone "is a medication that is often used in medication-assisted treatment (MAT) for opioid use disorder." https://americanaddictioncenters.org/suboxone

[6] At some of the visits, Dr. Gestring did not formally assess Plaintiff's memory but still noted that it was fair (Tr. 924, 926, 928).

stop taking Suboxone; Dr. Gestring noted that his memory and concentration were poor and he was "not tolerating the withdrawal" (Tr. 934). One week later, Plaintiff presented to Dr. Gestring and asked to be restarted on Suboxone (Tr. 936). Dr. Gestring agreed and again prescribed Suboxone to Plaintiff, noting that Plaintiff's concentration, judgment, and insight were fair and his memory (though not formally assessed) was "intact" (Tr. 936). Dr. Gestring made the same assessment of Plaintiff's mental status at the next two visits (Tr. 938, 940).

At some visits, Dr. Gestring described Plaintiff's speech as "slow speech pattern, soft spoken" (Tr. 912, 916, 918, 920, 922, 928, 930, 932, 934, 936, 938, 940, 943, 945, 948, 953). Other times, Dr. Gestring described his speech as "normal flow, clear to understand, normal tone" (Tr. 902, 904, 906, 908, 910, 914, 924, 926).

Plaintiff saw Dr. Gestring in December 2017 and Dr. Gestring noted that Plaintiff's intelligence was "below average" and his concentration was poor (Tr. 943). Until this visit, Dr. Gestring had always noted that Plaintiff's intelligence was average (Tr. 902-942). Dr. Gestring made the same assessment (poor concentration, intelligence below average) at Plaintiff's next two visits in January 2018 (Tr. 945, 948). At Plaintiff's subsequent visits in February and March 2018, his concentration, judgment, and insight were fair but Dr. Gestring continued to note that his intelligence was below average (Tr. 950, 953). On March 14, 2018, Plaintiff told Dr. Gersting that he felt "a disconnect with self leading to anxiety and irritability at times" (Tr. 953).

At Plaintiff's next three visits, he denied any acute symptoms related to depression or anxiety (Tr. 1145, 1148, 1151). Dr. Gersting noted that Plaintiff's judgment, insight, memory, and concentration were fair (*Id.*). Dr. Gersting described his speech as "soft spoken" (Tr. 1145, 1148, 1151). In May and June 2018, Dr. Gerstring tried different medications for Plaintiff's

Page **8** of **13**

ADHD and also adjusted Plaintiff's Adderall prescription at Plaintiff's request (Tr. 1148-1155). Plaintiff's concentration was poor at one visit during this time period, but his memory, judgment, and insight were fair and he denied any acute symptoms related to depression or anxiety (Tr. 1151-1161). Dr. Gestring adjusted Plaintiff's Adderall prescription again in August 2018 (Tr. 1159). For the rest of 2018 and until August 2019, Plaintiff's concentration, memory, and judgment were fair and he denied any acute symptoms related to depression, anxiety, or mania; his speech pattern was slow and he was soft spoken (Tr. 1160, 1163, 1165, 1167, 1169, 1171, 1173, 1175, 1177, 1179, 1181). Plaintiff made statements like "I am doing better" and "I am getting out more" and "I feel like things are changing for the better" (Tr. 1160, 1163, 1167).

On August 8, 2019, Plaintiff told Dr. Gersting that he was "having some issues with stability overall" and "anxiety" (Tr. 1183). Plaintiff's judgment, insight, memory and concentration were fair (*Id.*). For Plaintiff's speech, Dr. Gestring noted "normal flow, clear to understand, slow speech pattern" (*Id.*). At Plaintiff's next visit, he told Dr. Gestring that he was using CBD oil and it helped with his anxiety (Tr. 1186). Plaintiff continued taking Adderall and Suboxone (Tr. 1185, 1225, 1228, 1230). Dr. Gestring made more adjustments to Plaintiff's medication regimen for ADHD in 2020; in the months before and after those adjustments, he consistently noted that Plaintiff's memory, concentration, judgment, and insight were fair and Plaintiff (at most visits) denied any acute symptoms associated with depression, anxiety, or mania (Tr. 1212, 1215, 1219, 1221, 1223, 1227, 1228). Dr. Gestring described Plaintiff's speech as "normal flow, clear to understand, slow speech pattern" ((Tr. 1219, 23, 27).

### 4. Medical Opinions

**Dr. Gestring**

Dr. Gestring completed a Medical Source Statement regarding Plaintiff's limitations on January 21, 2019 (Tr. 965-968). He stated that Plaintiff had extreme limitations in the area of concentration, persistence, and pace, indicating that Plaintiff would miss work or leave early three times a month. (Tr. 965-66). He also noted that Plaintiff had extreme limitations in his ability to understand, remember, or apply information, and extreme limitations in his ability to interact with others (Tr. 966-97). Dr. Gestring indicated that Plaintiff could not interact with supervisors, coworkers, or the general public (Tr. 967). When asked to explain the signs and symptoms upon which he (Dr. Gestring) was basing his opinion, he wrote: "symptoms-ADHD, focus & concentration issues, daily panic attacks, generalized anxiety, insomnia, guarded affect, paranoia of public places/strangers, irritability, disorganized speech, uncontrollable outbursts" (Tr. 968).

Dr. Gestring made a similar assessment of Plaintiff's limitations in May 2020 (Tr. 1242-46). However, he noted that Plaintiff's ability to interact with others had improved since the previous assessment, indicating that Plaintiff could tolerate limited contact with supervisors (Tr. 1245). Dr. Gestring signed the following statement in September 2020:

> "When [Plaintiff] is in a closed structured environment, he does function seeming [sic] well….if [Plaintiff] is challenged or placed under stress which cannot be quickly adapt [sic], it has been evaluated that he becomes impaired and unable to handle the situation at hand….[w]hile [Plaintiff] is living with his father in a well-structured environment, he conveys stability for the most part. If [Plaintiff's] way of life is disrupted and he was forced to try and work, he could quickly become overwhelmed and impaired leading him to ultimately not being able to perform the tasks required or requested."

(Tr. 1271).

### Michael Carney, PhD

Dr. Michael Carney, a psychiatrist, completed a Medical Interrogatory on July 15, 2020 (Tr. 1262-67). Dr. Carney reviewd, *inter alia*, Dr. Gestring's records and noted that since April 2018, Plaintiff was "doing relatively well" (Tr. 1265). Plaintiff's mental status exams were generally "within normal limits" (*Id*.). Dr. Carney determined that based upon the records, Plaintiff had mild limitations in understanding/remembering/applying information and managing himself (Tr. 1264). Dr. Carney found that Plaintiff had moderate limitations in interacting with others and concentrating, persisting, or maintaining pace (Tr. 1264). Dr. Carney concluded that Plaintiff was "capable of performing simple, routine tasks with occasional contact with the public" (Tr. 1267).

## Analysis

The ALJ was not persuaded by Dr. Gestring's Medical Source Statements. Because Dr. Gestring is a treating physician, the ALJ was required to evaluate his opinions for their "supportability" (as evidenced by "objective medical evidence" and "supporting explanations" given by the medical source) and consistency "with the evidence from other medical sources and nonmedical sources in the claim." 42 C.F.R. §404.1520c(b)(2). Plaintiff contends that the ALJ "fails to identify any inconsistencies between Dr. Gestring's opinions and records." This contention is clearly refuted by the ALJ's citations to numerous records of Plaintiff's treatment with Dr. Gestring that indicated Plaintiff's concentration, memory, and judgment were fair on most of his visits with Dr. Gestring, and he rarely had acute symptoms of anxiety (Tr. 32, 33). While Dr. Gestring described Plaintiff's speech as "disorganized" in both the 2019 and 2020 Medical

Source Statements, the ALJ cited his notes that indicate Plaintiff's speech was either "normal flow, clear to understand" or, at worst, that Plaintiff had a "slow speech pattern" (Tr. 32). The ALJ also cited to records of Plaintiff's treatment with other providers that likewise indicated his memory, concentration, and speech were normal (Tr. 32, 33).

Plaintiff also contends that the ALJ's evaluation of Dr. Gestring's opinions reflects a "misunderstanding of mental health, which typically is manifested by periods of ups and downs." Certainly, the Seventh Circuit has explained "a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about [his] overall condition." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). The ALJ is required to analyze whether a medical opinion is "consistent with [the] treatment notes" as a whole. *Id*. Far from reflecting a "misunderstanding of mental health", the ALJ's decision painstakingly reviewed Plaintiff's numerous visits with Dr. Gestring from 2016-2020 (Tr. 32). The ALJ did not focus on Plaintiff's "better days"; in fact, she noted that Dr. Gestring's notes rarely, if ever, reflect that he had no impairments (*Id*.) She simply concluded that Plaintiff's level of debilitation as reflected in the records did not support Dr. Gestring's opinions.

Plaintiff's remaining arguments are also easily refuted by the ALJ's decision. Plaintiff contends that the ALJ improperly focused on the notes of Plaintiff's treatment sessions immediately before Dr. Gestring's assessments, instead of assessing Plaintiff's condition over time. While it is true that the ALJ did note the inconsistencies between Dr. Gestring's May 2020 statement and the notes of Plaintiff's April 2020 visit, the ALJ then immediately cited Plaintiff's four preceding visits. Moreover, she analyzed and cited the majority of Dr. Gestring's records elsewhere in the opinion, and "it would be a needless formality to have the ALJ repeat substantially

similar factual analyses." *Rice v. Barnhart*, 384 F.3d 363, 372 n. 15(7th Cir. 2004).

Finally, Plaintiff argues that the ALJ substituted her own opinion for Dr. Gestring's. Such a "substitution" clearly did not occur, as the ALJ relied upon the opinion of Dr. Michael Carney and made clear citations that demonstrated how Dr. Carney's opinions were consistent with Plaintiff's records of medical treatment. As previously noted, Dr. Gestring's opinions were neither supported by (nor consistent with) Plaintiff's medical records. The ALJ's decision clearly articulated her evaluation of the medical opinions. The Court will not substitute its judgment for that of the ALJ.

## Conclusion

After careful review of the record as a whole, the Court is convinced that the ALJ's findings are supported by substantial evidence and the ALJ did not make any errors of law. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**. The Clerk of Court is directed to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

**DATED: March 29, 2022**

*s/ Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**